Filed 4/8/15  In re J.H. CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re J. H., a Person Coming Under the Juvenile Court Law. | |
| SAN FRANCISCO HUMAN SERVICES AGENCY, <br><br>      Plaintiff and Respondent, <br><br> v. <br><br> D. B., <br><br>      Defendant and Appellant. | A142593 <br><br> (San Francisco City & County Super. Ct. No. JD14-3184) |

D. B. (Mother) appeals jurisdictional and dispositional orders finding her daughter, J. H. (Minor) a dependent child and removing her from Mother's care.  She contends the evidence is insufficient to support either the jurisdictional or the dispositional findings.  We shall affirm the orders.

## I.  BACKGROUND

### A.  Detention and Jurisdiction

Minor was detained in May 2014, shortly after she was born.  According to a detention report prepared by the San Francisco Human Services Agency, Family and Children's Services Division (the Agency), Mother's mother (Grandmother) had filed a missing person's report for Mother about two weeks before Minor was born.  After Mother was located, she was placed on a psychiatric hold pursuant to Welfare and

1

Institutions Code[1] section 5150 (5150 hold) and labeled "Gravely Disabled" because of her hallucinations and delusions. She declined psychiatric treatment. The officer who found Mother reported that Mother appeared agitated and unfocused. She had been contacting the FBI to make complaints about a child pornography ring with which her brother-in-law, a police officer in another state, was allegedly involved. Although Mother denied having had any previous mental health holds, a social worker said she had been put on a 5150 hold in 2010, and had received no follow-up mental health treatment or psychotropic medication.

Minor's father, L.H. (Father),[2] had a history of domestic violence, drug use, and assault, and was a registered sex offender. He had been convicted of rape in 1992, annoying or molesting children in 1994, failing to register as a sex offender in 2000, and sexual battery in 2004.

Minor was born at full term with no complications, was of normal weight, and tested negative for drugs. Mother behaved appropriately during her visits to the nursery.

A social worker spoke with Mother after Minor was born. Mother appeared calm. She told the social worker the mental health hold was the result of a mistaken identification. She said she had several lawsuits pending against defendants ranging from the medical clinic where she received her prenatal care to a university that had failed to grant her a Ph.D. in clinical psychology, and that she had pending restraining orders against her biological family because of an "atrocity" that had occurred in her family in the past. She asked to have Minor's last name changed in order to protect her from people wishing to harm her.

Mother was not aware Father was required to register as a sex offender and she said she had no concerns regarding him. She denied having received any current or past psychiatric care and said her mental health was not an issue.

---

[1] All statutory references are to the Welfare and Institutions Code.

[2] Father is not a party to this appeal.

2

The Agency filed a petition pursuant to section 300 alleging there was a substantial risk Minor would suffer serious physical harm or illness as a result of (1) the parents' inability to protect her and (2) Mother's mental illness, developmental disability, or substance abuse (§ 300, subd. (b)), and that there was a substantial risk Minor would be sexually abused by Father due to his criminal history (§ 300, subd. (d)).

## B.    Disposition Report

In a July 2014 disposition report, the Agency said it had been unable to obtain documentation about Mother's mental health because she had refused to sign releases. She said she had no mental health problems, had never been hospitalized, and had not been diagnosed with any mental illness. There was evidence, however, that she had been placed on a 5150 hold in 2010. Mother said she had completed all the coursework to obtain a doctorate in psychology, but that the university would not issue her degree; she said this was due to her family making false statements about her mental health.

Mother's family had been concerned about her mental status for several years, since her mental health deteriorated toward the end of her graduate work. Grandmother had been actively seeking help for Mother for years, including trying to keep in touch with Adult Protective Services and Child Protective Services, and felt she had lost her daughter to mental illness.

Mother had refused to be assessed by an Adult Mobile Crisis psychiatrist, and had refused services when offered them by Adult Protective Services. An FBI agent told the Agency that Mother had sought to file a report on May 1, 2014, shortly before Minor was born, and that she had been to the FBI office multiple times. After receiving her reports, the FBI determined they did not have merit and "were more indicative perhaps of someone with psychological issues."

The report noted that Mother's mental health had been a concern to most professionals with whom she came into contact. It appeared that she might be suffering ongoing delusions, and that she might have schizoaffective disorder or paranoid schizophrenia. She had refused to release her psychiatric records to the Agency, but it

3

appeared she had declined any psychiatric services after being released from the recent 5150 hold.

Mother had no known history of substance abuse. Father said he occasionally smoked marijuana and drank alcohol. He denied having used harder drugs, but he had at least one conviction for narcotics possession. He said several of his criminal convictions had occurred when he was under the influence and behaved inappropriately by "rubbing up against people, etc." He had not completed substance abuse treatment and did not think he needed it. A drug test had been positive for THC, the active ingredient in marijuana.

The disposition report provided a more detailed summary of Father's criminal history: he was a registered sex offender and had suffered convictions for misdemeanor sexual battery in 1991, three counts of misdemeanor annoying or molesting children in 1991, misdemeanor obstructing or resisting a police officer in 1991, felony rape in 1992, felony annoying or molesting children in 1994, felony burglary in 1999, felony failure to register as a sex offender in 2000, felony narcotics possession and felony marijuana possession in 2003, misdemeanor sexual battery in 2004, and felony possession of concentrated cannabis in 2009. Mother had no criminal record.

Mother and Father lived together in the home of a relative of Father's. Both parents denied that there was domestic violence in their relationship. Mother appeared to have obtained regular prenatal care during her pregnancy, although she had not signed releases to allow the social worker to see the documentation. Both Mother and Father handled Minor gently and with affection and were attentive to her needs at visits.

Minor had been placed in the home of a paternal great-aunt at the request of both parents. However, the great-aunt had recently reported that Mother's contact with her and other paternal relatives had "suddenly taken a very negative tone, somewhat bizarre tone." Grandmother had asked to have Minor placed with her, but Mother became so agitated at a discussion of her family that the Agency was concerned placement with Grandmother would interfere with the reunification process.

4

The Agency recommended that Minor remain in out-of-home placement and that both Mother and Father be offered reunification services, with a requirement that she undergo psychological assessment and adhere to any clinical recommendations for treatment. The disposition report noted that Mother was very bright and high functioning in many areas, but that she appeared to be suffering from delusions, paranoia, and an "inflated sense of self." She would make statements apparently meant to arouse interest or alarm, but then maintain an air of mystery about those statements. The Agency expressed concern as to whether Mother could care for Minor safely, since she appeared to be "actively psychotic and experiencing delusions," and psychosis "involves a degree of unpredictability that must be addressed when discussing the safe parenting of young children." Mother denied having mental issues, however, and was reluctant to participate in treatment. She had a history of feeling wronged by family members or care providers, and the Agency expressed concern that she would not be able to maintain relationships with Minor's service providers.

The Agency also recommended that Father undergo a psychological assessment, and expressed concern that Father was not more aware of or alarmed by Mother's mental state. He had attended several visits with Minor and behaved appropriately, but Mother had done much of the feeding and changing, and Father had left for periods of time during the visits.

## C.    Addendum Report

In an addendum report filed on July 15, 2014, the Agency noted that its concerns about Mother's mental state had deepened since the original dispositional report was submitted. The visitation supervisor had reported that Mother appeared to be actively suffering from paranoia and psychosis. Mother had reportedly been contacting authorities to report both a visitation center staff member, Lily McGowan, and the social worker. In Mother's email communications with the center, she referred to herself as "Dr. [Mother's name]/Agent Status," declared herself to be a "doctor and legal law enforcer," stated that McGowan, the visitation coordinator, was "in no way shape or form to be involved as Lily McGowan is misrepresenting Lily McGowan self," and made

5

statements such as "committing crimes against any person assigned to visitations is never allowed or tolerated."

According to the addendum report, problems had arisen during visits between Mother and Minor. At a visit in late June, Mother was told Minor's pediatrician had recommended that Minor receive only a certain type of formula. Mother insisted on feeding Minor the formula she had brought herself, despite being told that it seemed to upset Minor's stomach. At a visit the next day, when the visit monitor entered the room with Minor in her car seat, Mother aggressively snatched the car seat away and said she did not want the monitor taking Minor out of it. The monitor explained she was trying to soothe the baby, and Mother became upset and told her to be quiet. Minor's caregiver had not provided a bottle for the visit, because Mother had insisted on providing her own formula at other visits. When it became clear that Minor was hungry, the monitor suggested Mother buy formula from the store next door. Mother said it "wasn't her problem," and let Minor cry for 25 minutes before she called Father, who arranged for the caregiver to drop off a bottle.

The addendum report noted that Father remained "highly protective" of Mother and did not view her mental state as a primary concern.

**D.     Contested Hearing and Juvenile Court's Orders**

A contested jurisdictional and dispositional hearing took place on July 18, 2014. Social worker Jennifer Malcolm, who had prepared the detention report, testified as an expert in child welfare. According to Malcolm, when Mother was in the hospital after Minor's birth, she was calm and her behavior was appropriate. Mother had been placed on the 5150 hold two days before giving birth, and was released from the hold a day after Minor was born. Malcolm's decision to detain Minor was based on the 5150 hold, Mother's refusal to obtain services, and a police report indicating she was in a paranoid and delusional state.

Briana Lewis, the social worker who prepared the disposition report and detention report, also testified as an expert in child welfare. According to Lewis, the visitation supervisor had contacted her to express concern about Mother's mental heath and

6

stability. The staff at the visitation center believed Mother was showing paranoia and delusions, and said Mother's statements were "rambling and not quite making sense to them." These facts had strengthened Lewis's recommendation that Minor remain in an out-of-home placement while Mother and Father received reunification services.

Lewis acknowledged that Mother had no criminal history, that she had received prenatal care and attended a prenatal class, that she had housing, and that Father was employed. However, Mother had not signed releases to allow the Agency to review her medical records, so Lewis did not know specifically what prenatal care she had received. Mother possessed basic parenting skills and had an understanding of child development topics. Lewis also acknowledged that because Mother and Father had never had custody of Minor, it was "challenging" to assess Minor's safety in their care. However, she was concerned that Mother's statements suggested she was sometimes out of touch with reality. She also believed that Mother's paranoia and hostility to service providers could jeopardize her ability to provide consistent care to Minor. Minor's hospital records indicated Mother might have a diagnosis of either paranoid schizophrenia or schizoaffective disorder.

According to Lewis, Father had been arrested for domestic violence in 2011. Father told her he had taken domestic violence classes. He had not been arrested since then, and Lewis did not believe Minor was at risk due to violence between Mother and Father. Father had been testing randomly for drugs; the first test came back positive for marijuana, and all subsequent tests had been clean. Lewis believed Father's history of sexual offenses created a risk to Minor, both because it raised concerns about his judgment and because it showed a pattern of inappropriate relationships with vulnerable people. Father's last conviction for a sexual offense took place 11 years previously, and he had told Lewis his youngest victim was 16 years old.

Although Minor's current caregiver had been selected at Mother and Father's request, the caregiver had said she was not sure she was willing to continue to care for Minor in the long term because of Mother's increasingly hostile behavior.

An FBI agent testified that Mother went to the FBI office on May 1, 2014. His investigation showed she was the subject of a missing person report, and he called Mother's grandmother (Great-grandmother), who was listed as the contact on the missing person report. Mother had emailed the FBI on a number of occasions, and had come into the San Francisco office at least once previously. The story on the intake form Mother filled out was difficult to follow, and it appeared that the writer was disconnected from reality. According to the agent, Mother was "complaining about a conspiracy by local law enforcement entities to break into her car as retaliation for her reporting to the Central Intelligence Agency and the Department of Justice about a child pornography ring."

The agent spoke with Mother and told her he had spoken with her Grandmother and Great-grandmother. Mother told him she had obtained restraining orders against mother from the CIA and the Department of Justice. She indicated she had relationships with the United States Department of Justice and she named a contact within the CIA. The agent's investigation showed that she had no relationship with the Department of Justice, and that her CIA contact was a public relations official.

When the agent spoke with Grandmother, she expressed concern about Mother's mental state. The agent called the San Francisco Mental Health Crisis Hotline. He had seen that Mother was about eight months pregnant and thought a trained person should evaluate her. A few hours after Mother left the office, she called and asked to speak with the agent's supervisor. When he told her she could not do so, she said he would be hearing from her attorney.

Father testified that before Minor's birth, he and Mother had obtained clothing and other supplies for her. His last arrest was in 2010, for domestic violence. He had taken a 52-week domestic violence class as a condition of his probation. There had been no instances of sex crimes since his last conviction 11 years previously.

Father testified he was willing to engage in parenting classes. When asked if he would engage in therapy, he first replied, "It depends on what type of therapy you are talking about," and later said he would have therapy. He was not willing to have a

8

psychological evaluation because he did not see the purpose of it. He had visited Minor and wanted her home.

The juvenile court found true allegations pursuant to section 300, subdivision (b), that Mother was unable to care for Minor in that she had recently been put on a 5150 hold and labeled "gravely disabled" due to hallucinations and delusions and that she had been previously put on a 5150 hold but had refused treatment. The court amended the allegation to add the statement, "The mother currently suffers from a mental health disorder which prevents her from providing adequate care for the baby and the baby is at risk." The court also found true the allegations pursuant to section 300, subdivisions (b) and (d), that Father was a registered sex offender. The court found Minor's physical or emotional health required removal from the parents' physical custody, approved placement with relatives, and ordered reunification services for Mother and Father.

## II. DISCUSSION

### A. Jurisdictional Findings

Section 300, subdivision (b)(1), provides that a juvenile court may take jurisdiction of a child where "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child, . . . or by the inability of the parent or guardian to provide regular care for the child due to the parent's or guardian's mental illness, developmental disability, or substance abuse." Mother contends the evidence does not support a conclusion that her mental illness placed Minor at substantial risk of future harm.

Our standard of review is well settled. "We review the record to determine whether there is any substantial evidence, contradicted or not, which supports the court's conclusions. 'All conflicts must be resolved in favor of the respondent and all legitimate inferences indulged in to uphold the verdict, if possible.' [Citation.]" (*In re Kristin H.* (1996) 46 Cal.App.4th 1635, 1649.)

It has long been recognized that harm to a child cannot be presumed from the mere fact that a parent is mentally ill. (*In re Jamie M.* (1982) 134 Cal.App.3d 530, 540.) "The

proper basis for a ruling is expert testimony giving specific examples of the manner in which the mother's behavior has and will adversely affect the child or jeopardize the child's safety." (*Ibid*.) Thus, in *In re James R.* (2009) 176 Cal.App.4th 129, 136–137, the appellate court reversed a jurisdictional order where the mother had a history of mental instability and suicide attempts, but had never abused or neglected her children, there was no evidence her use of alcohol rendered her incapable of providing regular care for the children, the children's father was able to protect and supervise the children, the children were at school or day care while the father was at work, and the parents had the support of extended family members.

*In re Kristin H.* is instructive. The appellate court there upheld jurisdictional findings against a contention that they were unsupported by the evidence. (*In re Kristin H.*, *supra*, 46 Cal.App.4th at p. 1649.) The juvenile court found true an allegation that the mother had a long history of mental illness, with diagnoses of borderline personality, post-traumatic stress disorder, and major depression, and the Court of Appeal concluded the evidence supported this finding. (*Id*. at pp. 1651–1652.) The court also concluded the evidence was sufficient to support an allegation that there was a substantial risk the child would suffer serious physical harm: "[I]llustrations of the effect of the mother's mental health problems on Kristin's safety and well-being were provided here by . . . allegations in the petition and evidence in the record, such as the numerous reports from the visitation supervisors. In one such instance staff was obliged to call the police when the mother refused to physically release her daughter. Moreover, both of the mother's treating doctors stated shortly after the petition was filed that the mother's condition was such that Kristin should not be in her care at that time." (*Id*. at p. 1652.) The problems at visitation had included the mother engaging in angry outbursts and threatening to sue the staff at the visitation center. (*Id*. at pp. 1644, 1646.) The mother also argued that there was no evidence her refusal to take her psychotropic medications had harmed Kristin or posed a substantial risk of physical harm. (*Id*. at p. 1652.) The appellate court rejected this contention, noting that there was evidence the mother could not provide consistent parenting without medication, and her refusal to take her

10

medications could lead to further neglect "and in a larger sense illustrated the mother's unwillingness to accept and acknowledge how her mental problems contributed to her situation." (*Id*. at p. 1653.)

Here, multiple professionals had concerns about Mother's behavior. The social workers who testified as experts, the FBI agent, and staff who observed Mother at the visitation center all indicated that she suffered from a mental illness that could endanger her or Minor. Additionally, there is evidence that Mother has a history of concocting conspiracy theories, that Mother believes herself to be a doctor and "legal law enforcer," and that Mother had contacted authorities to report that the visitation center worker was "misrepresenting" herself. There is evidence that, despite having been placed on two 5150 holds, she has denied having mental health problems and has refused to be assessed for her mental illness. Moreover, there is evidence that Mother's irrationality affects her ability to care for Minor's most basic needs: at one visit, she insisted on giving Minor the formula she had brought, against the doctor's recommendation, and at the next visit, she allowed Minor to cry with hunger for nearly half an hour because she did not believe it was her job to provide formula for her baby daughter. Based on this record, the juvenile court could reasonably find Mother's mental illness placed Minor, a newborn infant, at substantial risk of physical harm.

Accordingly, we reject Mother's challenge to the juvenile court's jurisdictional finding based on her mental illness. Because we uphold jurisdiction on this ground, we need not consider her further contention that the evidence did not support the jurisdictional finding based on Father's history as a sex offender. (*In re I.A.* (2011) 201 Cal.App.4th 1484, 1492 ["[A]n appellate court may decline to address the evidentiary support for any remaining jurisdictional findings once a single finding has been found to be supported by the evidence."].)

**B.      Dispositional Order**

Mother also challenges the sufficiency of the evidence to support the order removing Minor from the home. She argues that the order was based on speculation that she would not be able to care for Minor properly, and contends that the record

"primarily" shows that she did a good job when she was allowed to care for Minor during visitation. Moreover, she points out, the record shows she and Father had housing, Father was employed and seeking additional employment, she had applied for public assistance, and she had acquired necessary supplies, such as a car seat, before Minor's birth.

"At a dispositional hearing, the court's findings must be made on clear and convincing evidence. The court must find that the welfare of the child requires that she be removed from parental custody because of a substantial danger, or risk of danger, to her physical health if she is returned home and that there are no reasonable means to protect her without removing her. [Citations.] On review, we employ the substantial evidence test, however bearing in mind the heightened burden of proof. [Citation.]" (*In re Kristin H.*, *supra*, 46 Cal.App.4th at p. 1654; see § 361, subd. (c)(1).)

As explained in *In re Cole C.* (2009) 174 Cal.App.4th 900, 917, "The parent need not be dangerous and the child need not have been actually harmed for removal to be appropriate. *The focus of the statute is on averting harm to the child.* [Citations.]" (Italics added; see also *In re I.J.* (2013) 56 Cal.4th 766, 773 [" 'The court need not wait until a child is seriously abused or injured to assume jurisdiction and take the steps necessary to protect the child.' "].)

Based on this record, the juvenile court could reasonably find Minor's welfare required her removal from the home. As we have explained, Mother's behavior and paranoia raised concern in both her family and in multiple professionals who came into contact with her. Despite two section 5150 holds, she refused to have a mental health assessment and it appears she has not engaged in mental health services. Her behavior affected Minor on at least two occasions—on one visit, she insisted on feeding Minor formula she had brought, despite being told it upset Minor's stomach. The following day, she aggressively grabbed the car seat—with Minor in it—from the visit monitor to keep her from removing Minor from the seat, and then refused to obtain formula for Minor as the infant cried with hunger for almost half an hour. Moreover, Father did not appear to view Mother's mental status as a concern. The juvenile court could reasonably conclude that in the present circumstances, with Mother unwilling to acknowledge or

treat her mental problems, Minor would not be safe in her parents' care. (See *In re Kristin H., supra,* 46 Cal.App.4th at pp. 1657–1658 [affirming removal where mother refused to cooperate with professionals in addressing substance abuse and mental problems]; compare *In re Jasmine G.* (2000) 82 Cal.App.4th 282, 288–289 [reversing removal order where both parents had forsworn corporal punishment of teenagers, expressed remorse for having used it, attended parenting classes, and undergone therapy].)

The cases upon which Mother relies do not persuade us otherwise. The minor *In re James T.* (1987) 190 Cal.App.3d 58, 61, was 16 years old. Because of conflicts in his relationship with his mother and the family's economic instability, he lived briefly with family friends; when that living situation ceased, a dependency petition was filed. (*Id.* at p. 62.) The juvenile court found there was substantial danger to the minor's emotional health if he were returned to his mother. (*Id.* at p. 63.) The appellate court reversed the dispositional order, concluding the facts were insufficient to sever, even temporarily, the parent-child relationship, and that the circumstances were "far from urgent and no attempts had been made to assist family unification." (*Id.* at p. 65.) In contrast to the minor in *James T.*, a resourceful and intelligent teenager (*id.* at pp. 61–62), Minor here is entirely helpless, and Mother has refused the Agency's attempts to help her address the mental health problems that gave rise to the dependency.

Nor does *In re Steve W.* (1990) 217 Cal.App.3d 10 assist Mother. The child there, an infant, was removed from his mother's custody after his father killed the child's half-brother. (*Id.* at pp. 12–14.) The children's mother testified that she did not intend to resume a relationship with the father and that she hoped he would stay in prison. She had assisted in the prosecution, had begun counseling, and was self-supporting. (*Id.* at pp. 15, 22.) The appellate court reversed the dispositional order removing Steve from his mother's custody, concluding it was based on "little more than speculation" that she would enter into another relationship with an abusive type of person. (*Id.* at p. 22.) Here, on the other hand, from the outset Mother has been unable or unwilling to acknowledge her mental problems or to obtain treatment.

13

*In re Paul E.* (1995) 39 Cal.App.4th 996 is no more helpful to Mother. The child there was a well-loved four-year-old who lived in a messy home. (*Id*. at p. 999.) After the court established dependency jurisdiction and the parents were given a service plan, the parents made improvements in their living conditions; however, social workers still found unsanitary and potentially hazardous conditions in the home. When the parents failed to remedy those conditions, the child was placed in a foster home. (*Id*. at pp. 999–1000.) The Court of Appeal reversed the order, reasoning that the mother was devoted to her son and willing to follow him around all day to keep him from hurting himself, that the child had not suffered any ill effects, and that chronic messiness, without resulting illness or accident, was not clear and convincing evidence of a substantial risk of harm. (*Id*. at p. 1005 & fn. 8.) Here, as we have explained, there was ample evidence to support a conclusion that Mother's mental illness presented a substantial risk to Minor's well-being and that she was unwilling or unable to recognize and treat her illness.

### III. DISPOSITION

The orders appealed from are affirmed.

_____
Rivera, J.

We concur:


_____
Reardon, Acting P.J.


_____
Streeter, J.


15